# EXHIBIT A

# Conway Carrier Broker Agreement

# CARRIER/BROKER AGREEMENT

THIS AGREEMENT is made and entered into on 8/20, 20 19, by and between JMS ("BROKER") and CoyWAy TRANSport ("CARRIER"), (collectively, the "PARTIES").

## I.

### Recitals

A. WHEREAS BROKER is licensed as a property broker by the Federal Motor Carrier Safety Administration ("FMCSA"), or by appropriate State agencies, and as a licensed broker, arranges for freight transportation; and

B. WHEREAS CARRIER is authorized to operate in inter-provincial, interstate and/or intrastate commerce and is qualified, competent and available to provide for the transportation services required by BROKER; and

NOW THEREFORE, intending to be legally bound, BROKER and CARRIER agree as follows:

## II.

### Agreement

1. **TERM AND TERMINATION**.

    (a) The Term of this Agreement shall be for one (1) year and shall automatically renew for successive one (1) year periods, provided, however, that either PARTY may terminate this Agreement at any time by giving forty-five (45) days prior written notice.

    (b) BROKER may additionally terminate this Agreement immediately upon written notice in any of the following events:

    i. CARRIER loses its operating authority or otherwise becomes disqualified to perform its obligations under this Agreement;
    ii. CARRIER breaches any covenant, obligation, condition, or requirement imposed upon it by this Agreement, and such breach continues for a period of ten (10) days after written notice thereof from BROKER to CARRIER;
    iii. CARRIER becomes insolvent or becomes unable to pay its debts in a timely manner;
    iv. CARRIER fails to comply with the performance metrics or selection criteria, if any, imposed upon it at any time by BROKER;
    v. CARRIER fails to procure and maintain any of the insurance coverages required by this Agreement; or
    vi. CARRIER utilizes the services of any brokers or subcontracts transportation of freight tendered by BROKER hereunder to any third party motor carrier or other transportation provider or utilizes a third party logistics provider to perform its obligations under this Agreement without prior written consent of BROKER.

    (c) CARRIER may additionally terminate this Agreement immediately upon written notice if BROKER breaches any covenant, obligation, condition, or requirement imposed upon it by this Agreement and such breach continues for a period of thirty (30) days after written notice thereof from CARRIER.

2. **CARRIER'S OPERATING AUTHORITY AND COMPLIANCE WITH LAW**. CARRIER represents and warrants that it is duly and legally qualified in accordance with all federal, state, provincial, territorial, and local laws, statutes, regulations, rules, and ordinances (collectively, "Applicable Law") to provide, as a contract carrier, the transportation services contemplated herein. CARRIER further represents and warrants that it does not have an unsatisfactory or unfit safety rating issued by any regulatory authority with jurisdiction over CARRIER's operations, including, but not limited to, the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT"). CARRIER further agrees to comply with all Applicable Law in the performance of its services under this Agreement. BROKER may, in its sole discretion, implement a motor carrier selection protocol which may be revised from time to time. If CARRIER fails to meet the requirements of any such protocol, BROKER may, in addition to any other rights and remedies available, including,

Initials 

but not limited to, termination, disqualify CARRIER from providing service to BROKER until such time as CARRIER is re-qualified in accordance with the provisions of the protocol. BROKER may, in its sole discretion, discontinue use CARRIER to provide any services until such time as CARRIER's operations are acceptable to BROKER. In the event that CARRIER receives an unsatisfactory or unfit safety rating, is notified that it may receive an unsatisfactory or unfit safety rating, fails to maintain insurance required hereunder, is notified that such insurance may become ineffective or is otherwise prohibited by Applicable Law from performing services hereunder, CARRIER shall immediately notify BROKER of such fact and shall not carry any loads or goods tendered to CARRIER by BROKER until such prohibition on operations is removed. CARRIER will be solely responsible for its day-to-day operations including, but not limited to, setting appropriate routes to ensure that transportation of shipments is accomplished in accordance with all Applicable Laws and to otherwise ensure shipments are not damaged in transit.

3. **PERFORMANCE OF SERVICES**.

   (a) CARRIER shall be solely responsible for controlling the method, manner and means of accomplishing CARRIER's services. CARRIER or its driver are responsible for determining the appropriate route for transportation. Any route directions provided by BROKER to CARRIER are provided as a convenience only and CARRIER shall have no obligation to follow such routing directions.

   (b) CARRIER's services under this Agreement are designed to meet the needs of BROKER under the specified rates and conditions set forth herein. CARRIER agrees that the terms and conditions of this Agreement apply to all shipments handled by CARRIER for BROKER and that the terms of this Agreement control the relationship between the PARTIES. Regardless of whether they are required by law, in no event shall any provisions of CARRIER's tariff, terms and conditions, service guide, bill of lading, or similar documentation apply to services provided under this Agreement.

   (c) CARRIER shall transport all shipments provided under this Agreement without delay, and all occurrences which would be probable or certain to cause delay shall be immediately communicated to BROKER by CARRIER. This Agreement does not grant CARRIER an exclusive right to perform any transportation related services for BROKER or the entity that has retained BROKER (hereinafter, the "Customer").

4. **RECEIPTS AND BILLS OF LADING**. Each shipment hereunder shall be evidenced by a bill of lading acceptable to BROKER naming CARRIER as the transporting carrier. The fact that BROKER is named as a "carrier" upon any applicable bill of lading shall not affect its status as a property broker. Upon delivery of each shipment made hereunder, CARRIER shall obtain a receipt showing the kind and quantity of product delivered to the consignee of such shipment at the destination specified by BROKER or the Customer, and CARRIER shall cause such receipt to be signed by the consignee. The bills of lading is intended to act as a receipt only. No terms, conditions or provisions of the bill of lading, manifest or other form of receipt or contract shall apply to services provided under this Agreement. CARRIER's failure to issue a bill of lading shall not affect its liability hereunder. CARRIER shall notify BROKER immediately of any exception made on the bill of lading or delivery receipt.

5. **CARRIER'S OPERATIONS**.

   (a) CARRIER shall, at its sole cost and expense:

      i. furnish all equipment necessary or required for the performance of its obligations hereunder (the "Equipment");
      ii. pay all expenses related, in any way, with the use and operation of the Equipment;
      iii. maintain the Equipment in good repair, mechanical condition and appearance; and
      iv. maintain records of Equipment use which will be provided to BROKER upon request.

   (b) CARRIER shall be responsible for the acts and omissions of each of its employees, agents, representatives, contractors, and subcontractors and shall utilize only competent and able personnel that are legally licensed in accordance with all Applicable Law to perform the services hereunder. CARRIER shall have full control of any personnel used in the provision of motor carrier services hereunder. CARRIER shall be solely responsible for ensuring, and will ensure, at CARRIER's cost and expense, that such personnel are fully qualified to perform services hereunder, and that such personnel have access to all locations into which access is necessary to perform services under this Agreement.

- 2 -

Initials

Without limiting the foregoing, CARRIER shall ensure that any personnel providing services have sufficient hours available to complete scheduled deliveries in accordance with, and without violation of, applicable hours of service regulations. CARRIER shall be solely responsible for determining whether scheduled services can be completed without violation of Applicable Law, and if services cannot be completed without violation of Applicable Law, shall notify BROKER prior to acceptance of load.

(c) CARRIER shall perform the services hereunder as an independent contractor, and assumes complete responsibility for all state and federal taxes, assessments, insurance (including, but not limited to, workers' compensation, unemployment compensation, disability, pension and social security insurance) and any other financial obligations arising out of the transportation performed hereunder.

(d) CARRIER shall be solely responsible for compliance with all provisions of Applicable Law regarding over dimension and overweight loads and air quality and environmental standards including, but not limited to, those of the California Air Resources Board ("CARB"). By entering into this Agreement, CARRIER acknowledges and agrees that it is aware of applicable CARB regulations, including the Truck and Bus Regulation ("TBR") at 13 C.C.R. § 2025, the Drayage Truck Regulation ("DTR") at 13 C.C.R. § 2027, the regulation on Transportation Refrigeration Units ("TRU") at 13 C.C.R. § 2477 et seq., and the Tractor Trailer Greenhouse Gas ("GHG") regulation at 17 C.C.R. § 95300 et seq., and has adopted policies and procedures to ensure compliance with such regulations, as they may be revised, adopted, and amended from time to time. CARRIER shall only dispatch and operate compliant vehicles (including vehicles with compliant TRUs) and shall maintain shipment-specific records evidencing such compliance, which records shall be provided to BROKER upon request. Without limiting the foregoing, if CARRIER operates TRUs in California under this Agreement, it shall ensure all such units are registered with the CARB's Equipment Registration system.

(e) With respect to transportation governed by regulations of the Food and Drug Administration ("FDA") codified at 21 C.F.R. Part 1.900, and regardless of whether such FDA regulations apply to CARRIER, CARRIER shall be responsible for the safety and sufficiency of all items used in the transportation of the goods, including all vehicles and Transportation Equipment as defined in such regulations. CARRIER is responsible for all sanitary conditions during transport. CARRIER must confirm the vehicle and Transportation Equipment is in appropriate physical condition to transport the goods tendered, and any such Equipment must be dry, leak proof, free of harmful or offensive odor, free from pest infestation and free from evidence of prior cargo that could render the shipment unsafe.

(f) In the event CARRIER is requested to transport waste or hazardous materials, CARRIER represents and warrants that it has obtained all necessary federal, state and provincial permits and registrations to transport hazardous materials or waste in inter-provincial, interstate and/or intrastate commerce. Upon request, CARRIER shall provide BROKER with a copy of all such federal and state permits and registrations. CARRIER further represents and warrants that, (i) it is in compliance with any and all Applicable Law related to such transportation, including, but not limited to 49 C.F.R. Parts 171-178, (ii) all drivers used to transport such shipments have undergone the necessary training requirements of all Applicable Law, and (iii) all drivers used to transport hazardous material have the proper endorsements on their Commercial Driver's License (or such analogous operator permit as is applicable to such driver) to legally transport such shipments. CARRIER acknowledges and agrees that BROKER's sole obligation with respect to requesting services with respect to such shipments is to pass through information (including commodity descriptions and classifications) and documentation (including shipping papers) provided to BROKER by the Customer. BROKER shall have no obligation to independently verify the accuracy of such information or documentation.

(g) CARRIER shall maintain appropriate security infrastructure to ensure the physical security of shipments and equipment handled under the terms of this Agreement.

6. **RATES & PAYMENTS.**

(a) Unless otherwise stated in a separate Rate Confirmation Agreement signed by the PARTIES, CARRIER will invoice and BROKER will pay the rates and charges set forth in Appendix A, for transportation services performed under this Agreement. CARRIER will send invoices to BROKER. CARRIER

Initials JC

represents and warrants that there are no other applicable rates or charges except those established in this Agreement or in any Rate Confirmation Sheet signed by BROKER. Appendix A can be supplemented or revised only by written agreement signed by both PARTIES.

(b) The Rate Confirmation Agreement shall be in the form specified in Appendix B. The Rate Confirmation Agreement shall be signed and agreed to by CARRIER and BROKER before each shipment to which such Rate Confirmation Agreement applies.

(c) In the event service is provided and it is subsequently discovered that there was no applicable or understood rate in Appendix A or in a separate Rate Confirmation Agreement, the PARTIES agree that the rate paid by BROKER and collected by CARRIER shall be the agreed upon contract rate of the PARTIES for the services provided, unless such rate is objected to by CARRIER in writing within 10 days of payment by BROKER.

(d) Payment by BROKER will be made within thirty (30) days of receipt by BROKER of CARRIER's freight bill, bill of lading, clear delivery receipt, and any other necessary billing documents enabling BROKER to ascertain that service has been provided at the agreed upon charge. As a condition to payment, CARRIER shall provide BROKER with a legible copy or photocopy of the bill of lading or other proof of delivery. CARRIER's failure to provide BROKER with a legible copy or photocopy of the bill of lading or other proof of delivery will result in CARRIER being held responsible to BROKER for any and all revenues that are uncollected by BROKER because of CARRIER's failure to provide needed support paperwork to BROKER.

(e) CARRIER agrees that BROKER has the exclusive right to handle all billing of freight charges to the Customer for the transportation services provided herein, and, as such, CARRIER agrees to refrain from all collection efforts against the shipper, receiver, or the Customer unless BROKER, in its sole discretion, expressly authorizes CARRIER in writing to collect from any such party, in which case, CARRIER's sole recourse will be against such party. Upon receipt of payment by BROKER, any right of CARRIER to payment from the Customer or any other third-party for services performed will be automatically assigned to BROKER.

(f) CARRIER further agrees that BROKER has the discretionary right to offset any payments owed to CARRIER hereunder for liability incurred by CARRIER, including, but not limited to, claims for freight, loss, damage, or delay.

(g) CARRIER shall submit all freight bills within 180 days of delivery or waive its right to payment for services rendered with respect to such late submitted invoices. Claims for undercharges must be brought within 180 days of BROKER's receipt of the original invoice giving rise to such undercharge claim. Assuming CARRIER has complied with the foregoing invoicing obligations, CARRIER shall bring suit related to unpaid freight charges or undercharges within 18 months of the date of delivery or its right to sue or otherwise seek payment shall be waived.

7. **WAIVER OF CARRIER'S LIEN.** CARRIER shall not withhold any goods transported under this Agreement on account of any dispute as to rates or any alleged failure of BROKER to pay charges incurred under this Agreement. CARRIER is relying upon the general credit of BROKER and hereby waives and releases all liens which CARRIER might otherwise have to any goods of BROKER or its Customer in the possession or control of CARRIER.

8. **FREIGHT LOSS, DAMAGE OR DELAY.**

(a) Unless otherwise set forth in Appendix A, CARRIER shall have the sole and exclusive care, custody and control of the cargo tendered hereunder from the time it is delivered to CARRIER for transportation until delivery to the consignee accompanied by the appropriate receipts. CARRIER shall notify BROKER immediately in the event any such cargo is lost (including stolen), damaged or destroyed, or in the event CARRIER becomes aware that applicable delivery schedules will not be met.

- 4 -

Initials ___

(b) CARRIER assumes the liability of a motor carrier under the Carmack Amendment as currently codified at 49 U.S.C. § 14706 for loss, delay, damage to or destruction of any and all goods or property tendered to CARRIER pursuant to this Agreement from the time the shipment is tendered to CARRIER until delivery.

(c) CARRIER shall be liable for the full invoice value of the cargo lost, damaged, delayed, or destroyed, as well as any additional costs or fees imposed upon BROKER by the cargo claimant, except that CARRIER's full value liability shall not exceed $100,000.00 (U.S. Dollars) per shipment unless agreed upon in writing by the PARTIES (such agreement may, but need not necessarily, take the form of a declared value declaration). No other limitation of liability shall apply unless specifically agreed to in writing by BROKER prior to CARRIER's receipt of the specific shipments to which such limitation applies, and BROKER's agreement to a limitation shall not be construed as a waiver of full value liability with respect to any other goods tendered to CARRIER.

(d) BROKER or its Customer may request that CARRIER accept a higher maximum liability. In such an event, the increased valuation will be stated in a separate Rate Confirmation Agreement or on the bill of lading. CARRIER's acceptance of the load shall evidence CARRIER's acknowledgement that CARRIER agrees that it will be liable for the increased valuation (of the full value of the goods, whichever is less), and that CARRIER agrees to maintain cargo insurance up to the full amount of such valuation. Upon request, CARRIER will provide BROKER or Customer evidence of such increased cargo insurance limits, which insurance will comply with the provisions of this Agreement governing cargo insurance.

(e) CARRIER waives any Applicable Law regarding processing of claims and handling of salvage, including, but not limited to, the provisions of 49 C.F.R. Part 370. CARRIER shall pay to BROKER, or allow BROKER to deduct from the amount BROKER owes CARRIER, Customer's full actual loss for the kind and quantity of commodities so lost, delayed, damaged or destroyed. Payments by CARRIER to BROKER or its Customer, pursuant to the provisions of this section, shall be made within thirty (30) days following receipt by CARRIER of BROKER's or Customer's undisputed claim and supporting documentation. CARRIER shall fully assist BROKER in investigating any claim for cargo loss, damage, delay, or destruction

(f) CARRIER waives any right to salvage goods subject to this provision, as well as any right to claim an offset for the value of salvage.

(g) Exclusions from coverage contained in CARRIER's Cargo Insurance as required herein shall not affect CARRIER's liability for freight loss, damage, or delay.

9. **INSURANCE.** Unless otherwise set forth in Appendix A, CARRIER shall procure and maintain, at its sole cost and expense, the following insurance coverages:

(a) Public liability and property damage insurance ("AL") covering all owned, non-owned, and hired vehicles (including any Trailers provided by BROKER or its Customer as addressed below) with a reputable and financially responsible insurance company insuring CARRIER in an amount not less than $1,000,000.00 (U.S. Dollars) per occurrence, or such larger amount as required by Applicable Law.

(b) Commercial General Liability ("CGL") Insurance covering the transportation of shipments and other operations under this Agreement in an amount not less than $1,000,000.00 (U.S. Dollars) per occurrence. Such insurance shall also cover CARRIER's contractual liability under this Agreement.

(c) All Risk Broad Form Motor Truck Cargo Legal Liability ("Cargo") insurance in an amount not less than $100,000.00 (U.S. Dollars) per occurrence. The coverage provided under the policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage relating to cargo claims including, but not limited to, exclusions for unattended or unattached trailers, theft, commodities transported under this Agreement, refrigerator breakdown or lack of refrigerator fuel.

(d) Statutory Workers' Compensation Insurance coverage in such amounts and in such form as required by applicable state law.

Initials JC

- 5 -

(c) All insurance policies required by this Agreement shall, as applicable, be primary and shall waive subrogation and contribution against BROKER. CARRIER shall furnish to BROKER written certificates obtained from the insurance carrier showing that such insurance has been procured, is being properly maintained, the expiration date, and specifying that written notice of cancellation or modification of the policies shall be given to BROKER at least thirty (30) days prior to such cancellation or modification. In addition, BROKER shall be named as an additional insured on CARRIER's CGL and AL policies, and as a loss payee on the Cargo policy as evidenced by an endorsement on the certificates of insurance. Upon request of BROKER or its designated insurance consultant, CARRIER shall provide BROKER, BROKER's consultant, or Customer with copies of the applicable insurance policies.

10. **USE OF BROKER'S TRAILER(S) BY CARRIER.** In the event that CARRIER utilizes a trailer, container, chassis or other equipment owned by or leased to BROKER or its Customer, or otherwise provided to CARRIER by BROKER or its Customer ("Trailer(s)") for the performance of the Services contemplated hereunder, CARRIER shall be liable for any damage to Trailers, destruction of Trailers, theft from Trailers, theft of any contents of Trailers, and for any claims for bodily injury (including death) or property damage arising from or related to any accident involving Trailer(s) regardless of whether such damage, injury, destruction, or theft is caused or occurs while the Trailer is attached or unattached to any power unit operated by CARRIER, except to the extent such damage, destruction, or theft is directly and proximately caused by the negligence, recklessness, or willful misconduct of BROKER or the Customer. The initial burden of proving such damage, injury, destruction, or theft was directly and proximately caused by the negligence, recklessness, or willful misconduct of BROKER or the Customer in any proceeding brought pursuant to this Agreement shall rest on CARRIER. In the event that applicable state law does not allow waiver of liability to the extent contained in this provision, the Parties expressly agree that BROKER's and Customer's liability will be waived to the fullest extent allowed by applicable state law. In no event will any such Trailer be used for any purpose other than performing Services hereunder, and in no event will CARRIER allow any third party or any power unit not operating under CARRIER's for-hire motor carrier authority to operate any such Trailer, unless expressly authorized to do so in writing which written notice must be specific to the movement at issue. CARRIER ACKNOWLEDGES AND AGREES THAT NEITHER BROKER NOR THE CUSTOMER MAKE ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE TRAILER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE.

11. **INDEMNITY.** CARRIER SHALL DEFEND, PAY, REIMBURSE, INDEMNIFY, AND HOLD BROKER, ITS CUSTOMER, AND EACH OF THEIR AFFILIATED ENTITIES HARMLESS FROM AND AGAINST ALL DIRECT OR INDIRECT LOSS, LIABILITY, DAMAGE, CLAIM, FINE, COST OR EXPENSE, INCLUDING REASONABLE ATTORNEY'S FEES, ARISING OUT OF OR IN ANY WAY RELATED TO THE PERFORMANCE OR BREACH OF THIS AGREEMENT BY CARRIER, ITS EMPLOYEES OR INDEPENDENT CONTRACTORS WORKING FOR CARRIER (COLLECTIVELY, THE "CLAIMS"), INCLUDING, BUT NOT LIMITED TO, CLAIMS FOR OR RELATED TO PERSONAL INJURY (INCLUDING DEATH), PROPERTY DAMAGE AND CARRIER'S POSSESSION, USE, MAINTENANCE, CUSTODY OR OPERATION OF THE EQUIPMENT; PROVIDED, HOWEVER, THAT CARRIER'S INDEMNIFICATION AND HOLD HARMLESS OBLIGATIONS UNDER THIS PARAGRAPH WILL NOT APPLY TO THE PRORATED EXTENT THAT ANY CLAIM IS DIRECTLY AND PROXIMATELY CAUSED BY THE NEGLIGENCE OR OTHER WRONGFUL CONDUCT OF THE PARTY TO BE DEFENDED, INDEMNIFIED OR HELD HARMLESS. CARRIER HEREBY EXPRESSLY WAIVES ANY EXCLUSIVE REMEDY DEFENSE, INCLUDING, BUT NOT LIMITED TO, THOSE AVAILABLE UNDER ANY WORKERS' COMPENSATION OR OTHER OCCUPATIONAL ACCIDENT STATUTORY REGIME, TO THE EXTENT NECESSARY TO EFFECTUATE CARRIER'S OBLIGATIONS UNDER THIS PROVISION.

12. **HANDLING, LOADING AND SEALING.**

    (a) CARRIER will comply with handling instructions provided by the shipper, consignor or consignee (including such instructions that may be passed through to CARRIER by BROKER) including, but not limited to, compliance with requirements related to transportation of temperature controlled shipments. Without in any way limiting the generality of the foregoing, CARRIER shall ensure that any shipments requiring controlled temperature transit are maintained at all times within required temperature ranges. If CARRIER is transporting cargo of a type that a reasonable person would understand to require controlled temperature transportation, but is not provided with instructions regarding such service, CARRIER shall request such instructions prior to accepting the cargo in question and, if controlled temperature service is declined, shall use reasonable efforts to obtain such declination in writing.

Initials: DC

(b) If goods are tendered to CARRIER and a reasonable person would understand that the goods require controlled temperature transportation, and CARRIER has not been provided instructions regarding controlled temperature goods, CARRIER shall request and obtain such instructions prior to loading the goods. If CARRIER receives contradictory or confusing instructions regarding any shipment, CARRIER must resolve the contradictory or confusing instructions prior to accepting the shipment for transport.

(c) Unless a shipment is loaded and sealed prior to arrival of CARRIER personnel, the manner of loading and securing freight upon Equipment shall be the sole responsibility of CARRIER. With respect to unsealed loads loaded prior to CARRIER's arrival, CARRIER shall be obligated to inspect such loading prior to departing. CARRIER represents that each driver utilized by it shall be competent to manage the loading and transportation of the goods subject to this Agreement.

(d) When required by BROKER, the shipper or the consignor, CARRIER shall secure shipments with a serialized seal. CARRIER shall ensure that the serialized seal number appears on the bill of lading or other form of manifest or receipt. CARRIER shall be solely responsible for maintaining seal integrity during transportation of the shipment. Except as is required by law enforcement personnel, under no circumstances shall CARRIER or any of its personnel break any seal without the express consent of BROKER. CARRIER shall immediately notify BROKER to report a missing or broken seal.

(e) In the event that law enforcement personnel require that CARRIER break any seal on any shipment, CARRIER shall document such fact on the bill of lading or other form of manifest or receipt by noting the law enforcement agency, time, location, and officer name and badge number. Upon completion of inspection by law enforcement personnel, CARRIER personnel shall immediately re-seal the shipment with a serialized seal and shall indicate the second seal number on the bill of lading or other form of manifest or receipt. Furthermore, CARRIER shall, as soon as reasonably possible after being required to break a seal by law enforcement personnel, communicate such fact to BROKER and, if not BROKER, the consignee of the shipment.

(f) CARRIER agrees that food that has been transported or offered for transport under conditions that are not in compliance with the load handling instructions, as provided to CARRIER, may be considered "adulterated," as determined by a qualified individual, within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 342(i), and its implementing regulations. CARRIER understands and agrees that adulterated shipments may be refused by the consignee or receiver, upon their delivery, at destination. CARRIER shall bear sole risk of rejection of cargo arising from or related to broken seals or failure to comply with load handling instructions.

13. **CONFIDENTIALITY AND NON-SOLICITATION.** Carrier will maintain records related to shipments transported under this Agreement, and with respect to shipments consisting of food, will also obtain records related to prior shipments transported in the same equipment, for a period of not less than three (3) years from the date of delivery. CARRIER will provide such records to BROKER upon BROKER's request, and regardless of whether this Agreement remains in effect at the time of such request. Unless otherwise set forth in Appendix A, neither party may disclose the terms of this Agreement to a third party without the written consent of the other party except (1) as required by law or regulation; (2) disclosure is made to its accountants, tax advisors, attorneys, or any parent, subsidiary or affiliate company; or (3) to facilitate rating or auditing of transportation charges by an authorized agent and such agent agrees to keep the terms of the Agreement confidential. CARRIER will not accept traffic, either directly or indirectly, from any shipper, consignor, consignee or customer of BROKER where: (1) the availability of such traffic first became known to CARRIER as a result of BROKER's efforts; or (2) the traffic of the shipper, consignor, consignee or customer of BROKER was first tendered to CARRIER by BROKER. If CARRIER breaches this Agreement and moves shipments obtained from such parties during the term of this Agreement or for twelve (12) months thereafter without utilizing the services of BROKER, CARRIER shall be obligated to pay BROKER, for a period of fifteen (15) months thereafter, commissions in the amount of thirty-five percent (35%) of the transportation revenue resulting from traffic transported in violation of this provision, and CARRIER shall provide BROKER with all documentation requested by BROKER to verify such transportation revenue. CARRIER shall not utilize BROKER's or the Customer's name or identity in any advertising or promotional communications without written confirmation of BROKER consent.

14. **SUB-CONTRACT PROHIBITION.** CARRIER specifically agrees that all freight tendered to it by BROKER shall be transported on equipment operated only under the for-hire motor carrier authority of CARRIER, and that CARRIER shall not in any manner sub-contract, broker, or in any other form arrange for the freight to be transported by a

- 7 -

Initials

third party without the prior written consent of BROKER. In the event that CARRIER breaches this provision, CARRIER shall remain directly liable to BROKER as if CARRIER transported such freight under its own authority in accordance with this provision, and shall further hold harmless and indemnify BROKER from any and all loss, liability, damage, claim, fine, cost or expense, including reasonable attorney's fees, arising out of or in any way related to the use of any subcontractor in violation of this provision regardless of whether arising from the conduct or omissions of CARRIER, the subcontractor, or any other third party. If CARRIER in any manner sub-contracts, brokers, or otherwise arranges for freight to be transported by a third party, in addition to any other rights and remedies available to BROKER, BROKER may, in its sole discretion, pay the underlying carrier directly, which payment will relieve BROKER of any and all payment obligations to CARRIER with respect to such load.

15. **BROKER'S RECORDS.** CARRIER hereby waives its right to obtain copies of BROKER's records as provided for under 49 C.F.R. Part 371. Notwithstanding the foregoing, to the extent that CARRIER obtains records set forth in 49 C.F.R. § 371.3 by any means whatsoever, CARRIER agrees to refrain from utilizing such records in negotiating for the provision of services with any third party, including existing customers of BROKER. CARRIER further agrees and understands that all such records comprise BROKER's confidential information and trade-secrets. Nothing in this section is intended to relieve CARRIER of any other obligations imposed upon it by this Agreement, or to limit any rights of BROKER to enforce such obligations.

16. **ASSIGNMENT/MODIFICATION/BENEFIT OF AGREEMENT.** This Agreement may not be assigned or transferred in whole or in part by CARRIER absent the prior written consent of BROKER, and supersedes all other agreements and all tariffs, rates, classifications and schedules published, filed or otherwise maintained by CARRIER. This Agreement shall be binding upon and inure to the benefit of the parties hereto.

17. **SEVERABILITY.** In the event that the operation of any portion of this Agreement results in a violation of any law, the parties agree that such portion shall be severable and that the remaining provisions of this Agreement shall continue in full force and effect.

18. **WAIVER.** CARRIER and BROKER expressly waive any and all rights and remedies allowed under 49 U.S.C. § 14101 to the extent that such rights and remedies conflict with this Agreement. Failure of BROKER to insist upon CARRIER's performance under this Agreement or to exercise any right or privilege arising hereunder shall not be a waiver of any BROKER's rights or privileges herein.

19. **NOTICE.** All notices or other communications required or permitted by this Agreement shall be effective upon receipt; shall be in writing; and shall be personally delivered, or mailed by registered or certified mail, return receipt requested, or sent by an overnight delivery service which provides proof of delivery, or sent by telecopy with a duplicate copy sent by first class mail, postage prepaid, as follows:

If to Carrier: Conway Transport LLC
1264 Cannonball Way
Independence Kentucky
41051

If to Broker: JMS Transportation Co., Inc.
5650 6th St SW
Cedar Rapids, IA 52404

20. **DISPUTE RESOLUTION.** This Agreement shall be deemed to have been drawn in accordance with the statutes and laws of the state of ___Iowa___. In the event of any disagreement or dispute, the laws of Iowa shall apply except to the extent superseded by applicable federal law. All such disagreements or disputes shall be submitted to the court of proper jurisdiction in the state of ___Iowa___, the PARTIES hereby agree to the exclusive jurisdiction such courts, and waive any defenses to venue in or personal jurisdiction of such courts. Notwithstanding the foregoing, the PARTIES may mutually agree in writing to submit any such disagreement or dispute to binding arbitration.

21. **COMPLETE AGREEMENT.** This Agreement constitutes the entire agreement of the Parties with reference to the subject matters herein, and may not be changed, waived, or modified except in writing signed by both Parties.

- 8 -

Initials DC

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their respective names by their duly authorized representatives as of the date first above written.

| BROKER | CARRIER |
|---|---|
| *[signature]* | Signature: *[signature]* Conway |
| Printed: Heather Nobbs-Thompson | Printed: Daly Conway |
| Date: 8/22/19 | Date: 8/20/2019 |
| Address: 5650 6th St SW<br>Cedar Rapids, IA 52404 | Address: 1264 Cannonball Way<br>Independence KY<br>41051 |
| Phone: 319-369-4200<br>Fax: 319-364-0882 | Phone: 859.940.8512<br>Fax:<br>FID No. 83-4364859 |

- 9 -

Initials *[initials]*

## APPENDIX A

1. **Rates.** In accordance with Paragraph 6 of the Agreement, the rates applying to the transportation services to be provided pursuant to the Agreement are set forth below:

2. **Payments.** In accordance with Paragraph 6 of the Agreement, any special payment requirements are set forth below:

3. **Freight Loss, Damage or Delay.** In accordance with Paragraph 8 of the Agreement, any special provisions dealing with cargo loss and damage claims are set forth below:

4. **Insurance.** In accordance with Paragraph 9 of the Agreement, any special insurance requirements are set forth below:

5. **Confidentiality and Non-Solicitation.** In accordance with Paragraph 13 of the Agreement, any exceptions or modifications to Confidentiality or non-solicitation provisions are set forth below:

BROKER

Printed: _Weather Hobbs-Thompson_

CARRIER

Signature: _[signature]_
Printed: _Andy Conway_

Appendix A - p. 1

Initials _[initials]_